**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

KIMBERLY RICHARDS,

    Plaintiff,

v.                                        Case No. 14-13103

WAYNE COUNTY AIRPORT AUTHORITY,

    Defendant.

                                        /

**OPINION AND ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Plaintiff Kimberly Richards filed a complaint against her former employer, Defendant Wayne County Airport Authority, alleging discrimination based on her sex, sexual harassment, and retaliation for complaining about sex discrimination in violation of Title VII of the Civil Rights Act of 1964. (Dkt. # 1.) Now before the court is Defendant's Motion for Summary Judgment. (Dkt. # 17.) Plaintiff filed a response to the motion in which she "concur[red] that her sexual harassment claim may not constitute a claim for hostile work environment based upon sexual harassment." (Dkt. # 20, Pg. ID 358.) The only remaining contested issue is whether Plaintiff's Title VII retaliation claim should survive Defendant's motion for summary judgment. This matter is fully briefed, and no hearing is needed. *See* E.D. Mich. LR 7.1(f)(2). For the reasons stated below, Defendant's Motion for Summary Judgment will be granted.

**I. BACKGROUND**

Defendant is an independent agency responsible for operating the Detroit Metropolitan Airport. (Dkt. # 17, Pg. ID 318.) Plaintiff worked for Defendant as a control

center operator in the security department from September 16, 2013 until February 27, 2014. (Dkt. # 1, Pg. ID 2.) As a control center operator, Plaintiff worked at a console in a control room monitoring alarms, logging alarms and maintenance issues, and dispatching appropriate officers when necessary. (Dkt. # 16-1, Pg. ID 90-91, 94.)

Plaintiff alleges that, "[a]lmost from the beginning of her employment, [she] experienced mistreatment and unequal treatment from her Operations Assist[]ant, John Voll, which treatment was harsher and more derogatory than the treatment received from Voll by her male-coworkers." (*Id.* at 2-3.) She alleges that Voll made negative comments concerning working with females, including the statements, "I gotta get out of this place, too many female hormones raging with all these women up in here" and, to a male coworker, "good luck in here with all these women." (*Id.* at 3.) Plaintiff also reported that Voll referred to a female security supervisor as "acting like the woman from *Diary of a Mad Black Woman*." (Dkt. # 16-10, Pg. ID 206.) Plaintiff complained about Voll's behavior to various supervisors as well as the Human Resources office. (Dkt. # 20, Pg. ID 356.) She alleges that Defendant did not address Voll's behavior. (*Id.*)

On November 20, 2013, Plaintiff submitted a written complaint regarding Voll's conduct to Systems Manager Julia Hornshaw; pursuant to Hornshaw's directions, Plaintiff revised the complaint twice and submitted the final version of November 27, 2013. (Dkt. # 20, Pg. ID 357; Dkt. # 16-10, Pg. ID 206.) According to Plaintiff, on December 3, 2013, Director of Labor Lynd Racey met with Plaintiff and gave her a Discrimination and/or Harassment Complaint form to complete. (Dkt. # 20, Pg. ID 357; Dkt. # 16-1, Pg. ID 118-19.) Plaintiff testified at her deposition that she did not complete

the form because she "was still on probation" at work and "didn't want to single anyone out at this time." (Dkt. # 16-1, Pg. ID 118.)

On December 27, 2013, Plaintiff sent another complaint about Voll to Hornshaw and Racey. According to Plaintiff, Racey met with Plaintiff and indicated that Voll would be required to "attend classes of some sort," but that Racey "did not necessarily consider Voll's behavior to be sexual harassment." (Dkt. # 20, Pg. ID 357.) According to the complaint, "sometime after [Plaintiff's] termination, Voll was terminated for his harassing behavior of fellow employees," but was subsequently reinstated. (*Id.* 3.)

Plaintiff was terminated from her employment with Defendant on February 27, 2014, "with the stated reason for her termination being 'performance issues.'" (Dkt. # 1, Pg. ID 4.) The record contains ample discussion of Plaintiff's difficulties performing her work duties and her supervisors' attempts to address Plaintiff's difficulties. Plaintiff's work performance is discussed in more detail below.

Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") on March 17, 2014, alleging sex discrimination and retaliation for complaining about sex discrimination. She was issued a Dismissal and Notice of Suit Rights on May 14, 2014. (*Id.* at 4.)

## II. STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497

(6th Cir. 2003). The movant has the initial burden of showing the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]hat burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (internal quotation marks omitted).

The burden then shifts to the nonmovant, who must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citation omitted). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

### III. DISCUSSION

The Supreme Court developed a burden-shifting framework for evaluating Title VII employment discrimination claims in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248 (1981). In evaluating retaliation claims under this framework, the "plaintiff has the initial burden to establish a prima facie case of retaliation." *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 574 (6th Cir. 2013). "The prima facie case consists of four elements: (1) the plaintiff engaged in activity protected under Title VII; (2) plaintiff's exercise of her protected rights was known to defendant; (3) an adverse employment action was subsequently taken against the employee or the employee was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment." *Id.* If the plaintiff establishes a prima facie case, the burden shifts to the defendant "to rebut the

presumption [of unlawful retaliation] by articulat[ing] some legitimate, nondiscriminatory reason for its action." *Id.* (internal quotation marks and citation omitted.) If the defendant produces a legitimate reason for its action, "then the burden of production returns to the plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination. While the burden of production shifts throughout the *McDonnell Douglas/Burdine* framework, the burden of persuasion always remains with the plaintiff." *Id.* at 675 (citations omitted).

Plaintiff argues that her termination, as well as Defendant's decision to prematurely place her on a day shift in regular rotation "while refusing to train her or answer her questions" both constitute adverse employment actions. (Dkt. # 20, Pg. ID 362.) Defendant concedes that Plaintiff's alleged retaliatory termination constitutes an adverse employment action. (Dkt. # 17, Pg. ID 343.) Defendant contends that Plaintiff did not prove a prima facie case of retaliation, arguing that Plaintiff's placement on the day shift was not an adverse employment action, that Plaintiff did not engage in a protected activity by reporting Voll's conduct to Defendant, and that there was no causal connection between the alleged protected activity and the adverse employment action. (Dkt. # 17, Pg. ID 343; Dkt. # 21, Pg. ID 367.)

The court need not determine whether Plaintiff established a case of prima facie retaliation. Even assuming Plaintiff had established a prima facie case of retaliation, Defendant has produced a legitimate non-discriminatory reason for Plaintiff's termination, and Plaintiff has failed to demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for discrimination.

**A. Defendant's Legitimate Non-Discriminatory Reason for Plaintiff's Termination**

Defendant provided a legitimate non-discriminatory reason for Plaintiff's termination and thus carried its burden to rebut the presumption of unlawful retaliation that would arise assuming Plaintiff established her prima facie case of retaliation. Defendant asserts that Plaintiff was terminated because she "failed to demonstrate basic knowledge of the [control center operator] position," and her "failure jeopardized airport security and compliance." (Dkt. # 17, Pg. ID 346.) The record is replete with evidence of Plaintiff's performance issues.

First, during her deposition, Plaintiff admitted that she "[c]onstantly" needed Voll's assistance when she worked with him. (Dkt. # 16-1, Pg. ID 108.) She clarified, "I would have to ask whoever is above me questions all day long." (*Id.*) She also stated during her deposition that "[n]obody can stay [in Plaintiff's job] because it's a tough job and nobody catches on." (*Id.* at 142.)

Second, on February 4, 2014, Plaintiff's co-worker Matthew Darde emailed Security Supervisor Karen Mucha and Hornshaw a list of seven instances when Plaintiff did not perform her job properly. (Dkt. # 16-25, Pg. ID 252.) The email states, "The biggest issues I see are the fact [Plaintiff] starts acknowled[ing] alarms and either does nothing about them, or clears them almost immediately, not knowing she acknowledges them." (*Id.*)

Third, Hornshaw wrote a memorandum on February 25, 2014, two days before Plaintiff's termination, which lists Plaintiff's performance issues and the instances when Plaintiff was confronted about her performance issues. (Dkt. # 16-22.) It ultimately recommends Plaintiff's termination. (*Id.* at 244.) The memorandum states that, while on average the training period for a control center operator is six to eight weeks, Plaintiff

6

took an addition eight weeks to complete training because she "had great difficulty with performing and recalling information during her training period." (Dkt. # 16-22, Pg. ID 241.) It states that Plaintiff "continues to struggle with performing daily tasks . . . , [including] dispatching alarms in a timely matter, logging alarms, logging maintenance issues, understanding the alarms she is acknowledging, understanding system issues and knowing what action to take when they occur." (*Id.*) According to the memorandum, Plaintiff expressed to Hornshaw that "she was trying and felt stressed and added the [control center operator] position is a really hard job." (*Id.*)

The memorandum states that Plaintiff had begun to show improvement and was given "shift rotation" on January 6, 2014. It states that, during meetings regarding performance concerns, she "would start to cry and tremble and would say she felt everyone wanted her to fail." (*Id.* at 241-42.) The memorandum identifies a number of specific instances when Plaintiff was confronted about performance issues, including:

- On January 27, 2014, Mucha, one of Plaintiff's supervisors, spoke with Plaintiff about "several tracker entries that were incomplete."

- As referenced above, on February 4, 2014, Darde informed Mucha and Hornshaw about "several performance concerns" involving Plaintiff. Mucha met with Plaintiff on February 6, 2014 to discuss the issues, and Plaintiff "became very defensive." Hornshaw wrote that Plaintiff "continues to blame others for her performance issues and does not take ownership for her actions or decisions."

- On February 6, 2014, Deputy Security Director Debra Sieg overheard one of Plaintiff's coworkers "conducting a thorough review of the purpose of the Status Groups with [Plaintiff]." "A Status Group Check is something that each shift performs two times per shift to ensure that the system is functioning properly and that there are no doors or gates unlocked or masked that may have been overlooked. [Plaintiff's] lack of understanding of the Status Group Checks and associated colors at this point her employment

7

>    is of great concern; this is an essential job function that must be performed by [control center operators'] twice on each shift."
>
> • On February 7, 2014, one of two available "card readers" was not working and Voll instructed Plaintiff to advise employees to use the functioning reader. Voll reported that Plaintiff informed a service technician about the malfunctioning reader, but did not inform employees. After employee traffic built up because they were unable to enter the parking lot, one of Plaintiff's supervisors instructed Security Control Operations to "open the gate." The supervisor noted that "there appeared to be no communication between [Voll] and [Plaintiff] during the event. In addition, [Plaintiff] appeared to have no idea where to look to open the gate arm to allow the employee access and she seemed to be extremely confused."
>
> • On February 10, 2014, Mucha and Hornshaw met with Plaintiff and a union representative and discussed "several of [Plaintiff's] performance issues." According to Hornshaw, Plaintiff "continued to point blame at everyone else . . . other than herself."

(Dkt. # 16-22, Pg. ID 241-43.)

The memorandum presents "a complete review of several performance issues that were discovered over the last several weeks" preceding the February 25, 2014 memorandum in which Plaintiff "failed to take proper action as she was trained and as identified in the SOP's."[1] (Dkt. # 16-22, Pg. ID 243.) The list of performance issues includes the following:

• On January 1, 2014, Plaintiff gave the United Lawn Service "multiple unlocks to complete [a] snow removal" even though common practice "would be to allow for the gate to remain open with a mobile . . . Officer positioned in the lane when the vehicle plowing is not actively securing the gate opening."

---

[1]"SOP" does not appear to be defined in the record. "SOP" often refers to "standard operating procedure. *See, e.g., Kindle v. City of Jeffersontown*, 589 F. App'x 747, 750 (6th Cir. 2014); *First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 336 (6th Cir. 2001).

8

- On January 27, 2014, Plaintiff acknowledged a door intrusion but did not dispatch an alarm responder.

- On February 1, 2014, Plaintiff acknowledged an incorrect door location twice when the alarm responder radioed alarm information.

- On February 1, 2014, Plaintiff reported to a co-worker that a door alarm had already been responded to, but an alarm responder had not yet been dispatched.

- On February 1, 2014, Plaintiff acknowledged a "door prop" but failed to investigate it.

- On February 3, 2014, Plaintiff acknowledged a door intrusion, but Plaintiff did not sent an alarm responder. Voll dispatched an officer to respond to the door intrusion 13 minutes after the alarm was signaled.

- On February 3, 2014, Plaintiff acknowledged a door prop alarm for a restricted door. Plaintiff dispatched an alarm responder who informed Plaintiff that the door was open and unattended. Plaintiff "did not complete a test prop or inform the Security Assistance of an open and unattended violation. [Plaintiff] logged the alarm indicating the prop was caused by the egress button. There is no egress button, as this door has a reader on each side."

- On February 6, 2014 and February 25, 2014, Plaintiff failed to log a maintenance issue with a gate that was stuck open.

(*Id.* at 243-44.)

The memorandum concludes:

[Plaintiff's] failure to dispatch response personnel to alarms is a serious failure of the Airport Security Program and could result in TSA civil penalty. It is an essential job function of a [control center operator] to ensure that alarms are properly responded to and investigated to ensure . . . there was not unauthorized access to the Airport's restricted areas. We have given [Plaintiff] ample training and time to successfully perform the core functions of a Control Center Operator. I am uncomfortable with [Plaintiff's] ability to work at the console in any capacity without strict oversight.

At this time, it is my recommendation that [Plaintiff's] probationary period be terminated.

(*Id.* at 244.)

9

In sum, Defendant has carried its burden of setting forth evidence supporting its legitimate, non-discriminatory reason for terminating Plaintiff—i.e., based on her poor performance.

**B. Defendant's Legitimate Non-Discriminatory Reason for Placing Plaintiff on the Day Shift**

Plaintiff contends that she was prematurely placed on the day shift in regular rotation, without adequate training, with the intent of giving Defendant an opportunity to terminate her for performance incidents. (Dkt. # 20, Pg. ID 362.) Assuming without deciding that Plaintiff's placement on the day shift itself constitutes an adverse employment action, Defendant has presented a legitimate non-discriminatory reason for her placement. Namely, Plaintiff had completed an additional eight weeks of training more than the average training period, and Hornshaw noted that Plaintiff "began to show some improvement" leading to her placement. (Dkt. # 16-22, Pg. ID 241.)

**C. Plaintiff Fails to Demonstrate by a Preponderance of the Evidence that Defendant's Legitimate Reasons Were Pretext for Discrimination**

Plaintiff has not demonstrated by a preponderance of the evidence that Defendant's reasons for placing Plaintiff on the day shift and for eventually terminating her were mere pretext for discrimination.

First, Plaintiff has failed to present evidence that her placement on the day shift was for a discriminatory purpose and that Defendant's non-discriminatory justification for her placement was mere pretext. She does not deny that she received initial training that lasted eight weeks longer than the typical training period. Additionally, she had stated that the training she received was similar to other similarly situated employees, which indicates that her level of training and placement were not the result of unlawful

discrimination.  For example, Plaintiff sent a text message concerning a new male control center operator which reads, "Poor [new control center operator] is getting the exact same treatment as I complained so much about.  Sitting there doing nothing most of the time and them [sic] I'm sure he'll get in trouble like me, when he lacks the job skills needed at the console."  (Dkt. # 16-29, Pg. ID 273.)  Likewise, she stated in her deposition that she and her co-workers talked "about how people leave all the time and [Defendant] can't keep anybody around [] because the training stinks."  (Dkt. # 16-1, Pg. ID 142.)  As discussed above, she also stated that "[n]obody can stay [in Plaintiff's job] because it's a tough job and nobody catches on."  (*Id.* at 142.)  She emphasized, "I can tell you every single person I talked to agreed with that statement . . . ."  (*Id.*)

      Thus, rather than presenting evidence that she was prematurely placed on a day shift with no support in retaliation for complaining about sexual harassment to create an opportunity to terminate her for poor performance, Plaintiff's own testimony and text messages support the inference that she was treated the same as her similarly situated co-workers.  Plaintiff's accusation that she was pre-maturely placed on a day shift for a nefarious purpose is unsupported by the record given that she received more training than a typical employee in her position, and because she concedes that she received the same type of training and support as her co-workers.

      Second, in an attempt to show that Plaintiff's job performance was mere pretext for her termination, she asserts that "her performance issues were easily explained and were not as severe as indicated by [Defendant]."  (Dkt. # 20, Pg. ID 363.)  She then states that Defendant relied upon "relatively minor performance shortcomings in

Plaintiff's performance . . . as pretext for the real reason for her termination, that being her repeated complaints of harassment and discrimination from Voll." (*Id.* at 363).

This conclusory statement is not enough to establish that Defendant's stated reason for terminating Plaintiff was mere pretext.[2] Under the Sixth Circuit's modified "honest belief rule," "for an employer to avoid a finding that its claimed nondiscriminatory reason was pretextual, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 713-14 (6th Cir. 2007) (internal quotation marks, citations, and emphasis omitted). Hornshaw's February 25, 2014 memorandum lists a number of particular instances of Plaintiff's job performance issues as well as Defendant's efforts to correct those issues. Plaintiff does not deny that the above listed performance issues occurred; instead, she suggests that her performance errors were both minor and explainable.

"Even when the employer makes such a showing [that it reasonably relied on particularized facts to terminate an employee for non-discriminatory purposes], "the

---

[2] Plaintiff suggests that "[t]he temporal proximity between [Plaintiff's] repeated complaints about Voll's behavior in November and December, 2013, and her termination in February 27, 2014 strongly indicates a causal connection between [Plaintiff's] complaints and the adverse employment action." (Dkt. # 20, Pg. ID 362.) However, the Sixth Circuit has held that "'an intervening legitimate reason' to take an adverse employment action dispels an inference of retaliation based on temporal proximity." *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 28 (6th Cir. 2013) (internal quotation marks and citation omitted). Darde's email regarding Plaintiff's performance deficiencies and the list of Plaintiff's performance problems described in Hornshaw's February 25, 2014 memorandum that occurred in January and February of 2014 present an intervening legitimate justification for her termination that dispels an inference of retaliation based on temporal proximity. The temporal proximity of Plaintiff's complaints and her termination is not enough to establish pretext.

protection afforded by the [honest belief] rule is not automatic. . . . [O]nce the employer is able to point to the particularized facts that motivated its decision, the employee has the opportunity to produce 'proof to the contrary.'" *Clay*, 501 F.3d at 714 (internal quotation marks and citations omitted). Plaintiff does not present any proof to the contrary; in fact, Plaintiff's admissions support Defendant's proffered justification for her termination. Plaintiff admitted that she found her job to be "tough" and that she "constantly" needed to ask for assistance "all day long." (Dkt. # 16-1, Pg. ID 108.) Plaintiff also sent a text message after she was terminated in which she stated that Darde's email listing instances where Plaintiff performed her job duties incorrectly "was my sole basis for my firing." (Dkt. # 16-31, Pg. ID 278.) These admissions, in addition to the list of Plaintiff's performance issues, provide ample support for Defendant's explanation for Plaintiff's termination.

Because there is no evidence that Defendant's concerns about Plaintiff's job performance were mere pretext for a retaliatory termination, Defendant's Motion for Summary Judgment will be granted.

## IV. CONCLUSION

IT IS ORDERED that Defendant's Motion for Summary Judgment (Dkt. # 17) is GRANTED.

       s/Robert H. Cleland
      ROBERT H. CLELAND
      UNITED STATES DISTRICT JUDGE

Dated: June 29, 2015

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, June 29, 2015, by electronic and/or ordinary mail.

                                           s/Lisa Wagner
                                           Case Manager and Deputy Clerk
                                           (313) 234-5522